AO 91 (Rev. 08/09)  Criminal Complaint

**FILED**

AUG 20 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| ADRIAN NAVARRO, a/k/a STONER; | )  Case No. **4-15-71061** |
| JESUS CORTES, a/k/a TRIGGER; | ) |
| JOSE LUIS CHAVEZ-NAVARRETE, a/k/a CHAMUCO | )  OAKLAND VENUE |
| | ) |
| _____ | )  ~~FILED UNDER SEAL~~  **MAG** |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of 24, 2015, and continuing through August 19, 2015 beginning on a date unknown, but no later than June    in the county of  Alameda    in the

Northern District    District of  California    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(C) | Conspiracy to distribute and to possess with intent to distribute controlled substances |

Penalties:

Imprisonment: Maximum 20 years
Fine: $1,000,000
Supervised Release: 3 years mandatory and
maximum life
Special Assessment: $100

This criminal complaint is based on these facts:
See the affidavit of ATF Special Agent James Talley attached hereto and incorporated by reference.

Continued on the attached sheet.

APPROVED AS TO FORM:

_____
AUSA KATIE B. MEDEARIS

_____
*Complainant's signature*

James Talley, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8/20/15

_____
*Judge's signature*

City and state:  Oakland, CA

Donna M. Ryu, United States Magistrate Judge
*Printed name and title*



1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  KATIE BURROUGHS MEDEARIS (CABN 262539)
   Assistant United States Attorney
5
       1301 Clay Street, Suite 340S
6      Oakland, California 94612
       Telephone: (510) 637-3680
7      FAX: (510) 637-3724
       katie.medearis@usdoj.gov
8
   Attorneys for United States of America
9

10                    UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                        OAKLAND DIVISION

13
   UNITED STATES OF AMERICA,              )  Case No.
14                                        )
          Plaintiff,                      )  AFFIDAVIT OF SPECIAL AGENT JAMES
15                                        )  TALLEY IN SUPPORT OF CRIMINAL
       v.                                 )  COMPLAINT
16                                        )
   ADRIAN NAVARRO,                        )  UNDER SEAL
17     a/k/a STONER,                      )
   JESUS CORTES,                          )
18     a/k/a TRIGGER, and                 )
   JOSE LUIS CHAVEZ-NAVARRETE,            )
19     a/k/a CHAMUCO,                     )
                                          )
20        Defendants.                     )
   _____)

21

22

23

24

25

26

27

28

   NAVARRO AFF. IN SUPPORT OF COMPL.
   UNDER SEAL

I, Special Agent ("SA") James Talley of the United States Department of Justice, Alcohol, Tobacco, Firearms and Explosives ("ATF") do swear and affirm as follows:

I.    **INTRODUCTION**

    A.    <u>**Purpose of Affidavit**</u>

      1.    I make this affidavit in support of a criminal complaint against Adrian NAVARRO, also known as ("a.k.a.") "STONER" (hereafter, "NAVARRO"), Jesus CORTES, a.k.a. "TRIGGER" (hereafter, "CORTES"), and Jose Luis CHAVEZ-NAVARRETE, a.k.a. "CHAMUCO" (hereafter, "CHAVEZ-NAVARRETE") (referred to collectively herein as the "Defendants") for a violation of 21 U.S.C. §§ 846 and 841(a)(1),(b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances). I believe the information included herein establishes probable cause the Defendants, beginning on a date unknown, but no later than June 24, 2015, and continuing through August 19, 2015, conspired to possess with intent to distribute controlled substances, including methamphetamine and cocaine, in the Northern District of California. An undercover investigation that began in June 2015 revealed that Adrian NAVARRO, Jesus CORTES, and Jose Luis CHAVEZ-NAVARRETE are co-conspirators and engaged in the distribution of methamphetamine. An undercover officer (assisted by a confidential informant) was able to make several methamphetamine purchases from the group.    CORTES and CHAVEZ-NAVARRETE were arrested on August 19, 2015, through a ruse in which they thought they were providing security for a drug transaction. NAVARRO has not been arrested yet for the conduct alleged herein.

    B.    <u>**Sources of information**</u>

      2.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers who have participated in this investigation, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein (including de-briefs of a confidential informant),[1] my review of covert audio and/or video recordings of controlled purchases of suspected narcotics, and information

---

[1] The reliability of the confidential informant involved in the subject investigation is discussed separately herein.

1   gained through my training and experience. Because this affidavit is submitted for the limited purpose
2   of establishing probable cause in support of a complaint, it does not set forth each and every fact that I,
3   or others, have learned during the course of this investigation.

4   **II.    AFFIANT BACKGROUND AND APPLICABLE LAW**

5       A.    <u>**Agent Experience and Background**</u>

6       3.    I am an ATF SA and have been so employed since April of 2013. I am presently
7   assigned to the ATF Oakland Field Office in Oakland, California. I am a law enforcement officer of the
8   United States within the meaning of Title 18, United States Code, Section 2510(7). I was trained as an
9   ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

10      4.    Prior to my employment with the ATF, I was a law enforcement officer in the state of
11  Florida (Winter Springs Police Department) for 8 years, the last two of which were as a shift supervisor
12  (Sergeant). During my time as a police officer/SWAT team member in Florida, I participated in
13  physical surveillance operations as well as in the execution of both federal search warrants, along with
14  state arrest and search warrants. Prior to and during my time as a police officer, I served in the United
15  States Army. During my time in the military, I served as a Special Forces Engineer (Green Beret). As a
16  Special Forces Soldier I have been exposed to numerous weapon systems, explosives, and tactics.

17      5.    During the course of my law enforcement career, including my time as an ATF SA and
18  police officer, I have been involved in investigations of numerous criminal offenses, including those
19  offenses related to this current investigation. I have participated in various types of investigative
20  techniques, to include: physical and electronic surveillance, undercover agents and informants, and
21  controlled purchases of firearms and narcotics from suspects. I have participated in physical
22  surveillance operations and the execution of federal arrest and search warrants. I have also worked with
23  informants/cooperators and undercover agents and have monitored meetings and consensual telephone
24  conversations with drug and firearms dealers involving informants and undercover agents. During
25  physical surveillances, I have personally observed drug and firearms transactions, counter-surveillance
26  techniques, and the methods used by these traffickers use to conduct clandestine meetings. In addition
27  to using a variety of investigative techniques, I have analyzed information obtained from traditional
28  record searches and from the review of previous case files. I have also been trained on the subject of

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                          3

1  firearms and ammunition interstate nexus and trafficking techniques.

2      6.    Further, I have become familiar with the manner in which drug and firearms traffickers

3  smuggle, transport, store, and distribute drugs/firearms, as well as how they collect and launder proceeds

4  derived from the sale of such items.  I am also familiar with the manner in which drug and firearms

5  traffickers use telephones, cellular telephone technology, coded or slang-filled telephone conversations,

6  false or fictitious identities, and other means to facilitate their illegal activities and thwart law

7  enforcement investigations.

8      7.    Where drug slang or a drug-trafficking or firearms-trafficking related reference is used by

9  one of the target subjects, I have included an explanation in parentheses following such reference.  My

10  explanation is based on my training, experience, and familiarity with the subject investigation.  My

11  understanding of the significance and meaning of the slang or reference may change as the investigation

12  progresses.  Facts not set forth herein are not being relied on in reaching my conclusion that the

13  requested order should be issued.  Nor do I request that this Court rely on any facts not set forth herein

14  reviewing this application.

15      **B.    <u>Applicable Law</u>**

16      8.    Title 21, United States, Code Section 846 prohibits a person from conspiring to possess,

17  manufacture, distribute, dispensing, or possess with intent to manufacture, distribute, or dispense a

18  controlled substance and from conspiring to commit any of the aforementioned crimes.  The elements of

19  the offense are as follows:

20      (a)    there was an agreement between two or more people to possess with the intent to

21      distribute a controlled substance;

22      (b)    the defendant joined that agreement knowing its purpose and intending to help

23      accomplish that purpose.

24  **III.    FACTS ESTABLISHING PROBABLE CAUSE[2]**

25      **A.    <u>Overview of Defendants' Criminal Histories</u>**

26      9.    Based on a review of their criminal histories, CHAVEZ-NAVARRETE and NAVARRO

27

28  _____

[2] The facts discussed herein present some of the investigation that led up to the arrests and subject complaint, but are not inclusive of all interactions with or evidence against the Defendants.
NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                4

1   have both incurred multiple felonies and sustained other arrests.  CHAVEZ-NAVARRETE was

2   convicted of felony car-jacking (Cal. Pen. Code § 215) in 2005 and felony possession of a controlled

3   substance for sale (Cal. H&S Code §11378) in 2010.  In addition, an ATF SA also confirmed with a

4   Contra Costa Probation Officer that CHAVEZ-NAVARRETE is currently on formal probation with full

5   search clause and gang terms.[3]  NAVARRO was convicted twice of felony taking of a vehicle without

6   consent (Cal. V.C. § 10851(A)) in 2010, felony possession of a firearm (Cal. Pen. Code § 29800(A)(1))

7   in 2012, felony taking of a vehicle without consent (Cal. V.C. § 10851), and misdemeanor participation

8   in a street gang (Cal. Pen. Code § 186.22(A)) in 2013.  CORTES has not incurred any felony

9   convictions, but he has been arrested on numerous occasions, including for the following offenses:

10  robbery (2012), probation violation (2013), possession of narcotics/controlled substance (2015), and

11  possession of marijuana and related probation violation (2014).

12       **B.**   **Drug Transactions**

13           ***1.***   ***June 23 and 24, 2015: Meeting with NAVARRO and Subsequent Purchase of Methamphetamine[4]***

14

15             *i.*   <u>*CI Introduction to NAVARRO*</u>

16      10.   On June 23, 2015, an ATF SA spoke to a confidential informant (hereafter, the "CI")[5]

17  regarding his/her contact with Adrian NAVARRO.  The CI was introduced to NAVARRO by a third

18  party, who represented NAVARRO as a drug supplier for ounce and larger quantities of crystal

19  methamphetamine.

20

21  ------------------------------------

22     [3] Concord Police Department ("CPD") Gang Unit advised that CORTES and CHAVEZ-NAVARRETE are documented members of the "South Side Locos" (hereafter, "SSL") gang, which is a

23  subset of the Sureños gang. Based on law enforcement intelligence and other sources described herein, I also believe NAVARRO is a member of the SSL gang.

24     [4] The suspected methamphetamine substances purchased by the UC/CI discussed herein tested presumptive positive for the presence of methamphetamine.  Further, the appearance of the purchased

25  substances is consistent with methamphetamine based on my training and experience.  Complete laboratory analysis of the substances remains pending.

26     [5] The CI has been working with law enforcement since approximately 2001.  The CI initially began cooperating with law enforcement in exchange for consideration on a pending drug case.  He/she

27  later continued to  cooperate in exchange for monetary compensation.  To date, I am unaware of any instances in which the CI has been unreliable and his/her information has been repeatedly corroborated

28  via recordings, interviews, electronic and physical surveillance operations, and via other sources.  The CI has not incurred any felony convictions.

NAVARRO AFF. IN SUPPORT OF COMPL.

[UNDER SEAL]                                         5

11.     On or about June 23, 2015, the CI and the third party traveled to 1082 Mohr Lane, Apt B., in Concord, California. The third party introduced NAVARRO as "STONER" and the CI informed NAVARRO that he/she wished to acquire large amounts of crystal methamphetamine on behalf of his/her cousin (i.e. the "UC").[6]  The CI asked if NAVARRO could supply a "QP" (street slang for a quarter-pound).  NAVARRO replied that a "QP" was not too much and costs $1,200 to $1,500.  The CI informed NAVARRO that he/she, along with the UC, would like to purchase the "QP" the following day.

12.     After the meeting, the CI reviewed two (2) booking photographs of NAVARRO and identified the individual in the photographs as "STONER."

### ii.    *Recorded Telephone Calls Prior to Drug Purchase*

13.     On June 23, 2015, the CI placed a recorded a call to NAVARRO at telephone number (925) 948-6993.[7]  The CI said he/she spoke with his/her cousin (an undercover agent referred to herein as the "UC") and they could meet NAVARRO the following day in Concord.  NAVARRO asked if they wanted the "Q" ("Q" is a street slang term commonly used to refer to a quarter pound measurement of crystal meth) and the CI affirmed.  They also discussed the price and NAVARRO informed the CI that he would need to make a call (i.e. contact his supplier), but it should be less than $1,400.  They agreed to speak again the next day to coordinate the meeting location.

14.     Later that day, the CI received a call from NAVARRO.  NAVARRO stated he had talked to his "boys" (i.e. suppliers, associates, and/or gang members) and the price for the methamphetamine would be $1,500.  NAVARRO also told the CI to call at 9:30 a.m. the following day so that he could have everything ready by 10:00 a.m.

15.     On June 24, 2015, at approximately 9:14 a.m., the CI received a call from NAVARRO.  The participants confirmed their anticipated meeting, but not the location.  NAVARRO said he would call his source and then call the CI again.

16.     On this same date, at approximately 9:25am, the CI received a call from NAVARRO.

---

[6] The information contained herein regarding the June 23, 2015 meeting is based on the debrief of the CI.

[7] NAVARRO used cellular telephone number (925) 948-6993 during all of his telephonic communications with the CI discussed herein. These calls were also recorded unless otherwise noted.

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                                    6

1    NAVARRO explained the methamphetamine was ready, but he left it at his "boy's" (i.e. associate's,

2    supplier's and/or gang member's) house to avoid driving around with a large quantity of drugs.

3    NAVARRO then told the CI to meet him on Virginia Lane in Concord.  The CI agreed and said he/she

4    would call NAVARRO when the UC arrived.

5        17.    On this same date, at approximately 9:39 a.m., the CI received a call from NAVARRO.

6    During the call, the CI explained he/she and the UC worked together to distribute drugs outside

7    California and the UC wanted to meet NAVARRO.  NAVARRO said he spoke with an associate about

8    using FedEx to transport and ship methamphetamine and his associate said it was "hot" (i.e. a dangerous

9    means of transport because of law enforcement attention) at the moment.

10        18.    On this same date, at approximately 9:48 a.m., the CI received another call from

11    NAVARRO, wherein they agreed to meet in front of an apartment complex in Concord, and then travel

12    together to NAVARRO's source of supply.

13                    *iii.*    *Drug Transaction Involving NAVARRO, CHAVEZ-NAVARRETTE, and*
                               *CORTES*
14

15        19.    On June 24, 2015, at approximately 9:51 a.m., the UC arrived at an apartment complex in

16    Concord and met with the CI and NAVARRO, who was introduced by the CI as "Stoner."  They then

17    entered the UCV together and NAVARRO instructed the UC to drive to a nearby "Monterrey

18    Apartments" complex.[8]  NAVARRO said he sent methamphetamine to Virginia via FedEx, but one of

19    his associates was recently arrested for such conduct.  NAVARRO shared his strategy for shipping drugs

20    via FedEx on Friday afternoons because they were rushed through during this time frame.  At

21    approximately 9:53 a.m., NAVARRO called his source and said the source was in route and would

22    arrive in about ten minutes.  NAVARRO then spoke about his associates (i.e. gang members) and said

23    some are in charge of "dope" and others are in charge of "guns."  NAVARRO added that one of his

24    associates said someone was recently killed and it was "hot right now" (i.e. dangerous) so  they would

25    be "hitting pads for guns" (i.e. robbing houses for firearms).  NAVARRO added that his gun source

26    would sell firearms to the UC once their relationship was established.  At approximately 9:59 a.m., they

27

28    _____
       [8] Their interactions were recorded on an audio-video device located within the UCV.
     NAVARRO AFF. IN SUPPORT OF COMPL.
     [UNDER SEAL]                              7

1  arrived at the Monterey Club Apartments, located at 1411 Monument Boulevard in Concord, California

2  (hereafter, the "Monterey Club Apts.") and the UC parked the UCV.

3      20.    On this same date, at approximately 10:11 a.m., a Honda sedan arrived with two male

4  occupants and parked near the UCV at the Monterey Club Apts.  The occupants of both cars exited.  The

5  Honda passenger introduced himself to the UC as "Trigger" (later identified as CORTES, a.k.a.

6  "TRIGGER") and the driver introduced himself as "C" (later identified as CHAVEZ-NAVARRETE,

7  a.k.a. "CHAMUCO").  CORTES then provided NAVARRO with a small package.  Next, the UC and

8  NAVARRO entered the UCV and NAVARRO handed the UC a package containing approximately

9  116.9 grams of methamphetamine.  The UC paid NAVARRO $1,500.  Afterwards, NAVARRO said he

10  would stay with CORTES and CHAVEZ-NAVARRETE and their meeting ended.

          **2.**    ***July 1, 2015: Purchase of Methamphetamine from NAVARRO and CHAVEZ-NAVARRETE and Discussion Regarding Firearms Trafficking***

13      21.    On June 29 and 30, 2015, the CI and NAVARRO spoke by telephone and arranged for

14  the CI and the UC to purchase one-half pound of methamphetamine from NAVARRO in exchange for

15  $3,000.  They also agreed to conduct the transaction at 10:30 a.m. on July 1, 2015 and meet at the

16  Monterey Club Apts.

17      22.    On July 1, 2015, at approximately 10:24 a.m., NAVARRO called the CI and said "they"

18  were running late and would arrive in roughly 30 minutes.  At approximately 11:14 am, the UC and CI

19  arrived at 1391 Monument Blvd, Concord, California.  Upon entering the complex, the UC observed a

20  white Honda occupied by three individuals; the UC also recognized the driver as CHAVEZ-

21  NAVARRETE and one of the occupants as NAVARRO.  (The UC was unable to identify the other

22  passenger, who remained inside the vehicle.)  Upon the UC arriving, NAVARRO exited the Honda and

23  met with the UC and CI in the UCV.  NAVARRO handed a package containing approximately 234.8

24  grams methamphetamine to the UC, who provided him with $3,000 in exchange.

25      23.    The UC then discussed purchasing "straps" (slang for firearms) from NAVARRO and his

26  associates for purposes of reselling firearms in Mexico.  The UC asked NAVARRO if his associates

27  would be able to sell the UC firearms and it did not matter if the firearms were "big, short, long" (i.e.

28  pistols, rifles, etc.) or "hot" (i.e. stolen) because the UC had associates who removed the serial numbers

1  from firearms. NAVARRO agreed to speak with his "homies" (i.e. gang members) and offered to bring

2  these associates to meet with the UC to discuss details. NAVARRO exited the UCV, returned to the

3  Honda, and the meeting concluded. On this same date, at approximately 1:37 p.m., the CI called

4  NAVARRO to discuss purchasing firearms. They agreed meet the following week.

### 3.  July 8, 2015: Purchase of Methamphetamine from NAVARRO

6  24.    On July 7, 2015, at approximately 2:56 p.m., the CI called NAVARRO and asked if

7  NAVARRO had acquired firearms. NAVARRO responded affirmatively and said he talked to his

8  associates and they wanted to know if the UC and the CI still wanted to do the transaction the following

9  day. The CI inquired as to the type and price of the firearms. NAVARRO said he needed to contact his

10  source to find out and agreed to call the CI later with the details. The CI said the UC also wished to

11  purchase another half-pound of methamphetamine the following day and NAVARRO affirmed.

12  25.    On this same date, at approximately 3:00 p.m., NAVARRO called the CI and said his

13  source had an AR-15 ("AR" is short for assault rifle) and a new .357 caliber pistol and quoted prices for

14  the firearms and requested methamphetamine. The participants then agreed to meet the following day.

15  26.    On July 8, 2015, at approximately 10:21 a.m., NAVARRO called the CI to confirm the

16  anticipated meeting. NAVARRO also said he was going to meet up with his associates and they would

17  meet the CI and UC at the agreed upon location.

18  27.    On this same date, at approximately 10:46 a.m., NAVARRO called the CI and said the

19  AR-15 was at a stash house, but the source at the stash house was not answering his telephone so

20  NAVARRO would acquire it later. The CI asked if NAVARRO still had the other gun and drugs and

21  NAVARRO affirmed.

22  28.    On this same date, at approximately 11:19 a.m., the UC and the CI arrived at the

23  Monument Oak Apartments located at 1391 Monument Blvd. in Concord, California (hereafter, the

24  "Monument Oak Apts."). Soon thereafter, NAVARRO arrived in a Volkswagen Passat, parked near the

25  UCV, and entered the UCV. NAVARRO delivered approximately 238.7 grams of methamphetamine to

26  the UC in exchange for $3,000 and stated that it was a "half P" (i.e. one-half of a pound). NAVARRO

27  said he was waiting for the AR-15 source to answer the telephone. The UC acknowledged and

28  NAVARRO agreed to call the CI when he had both firearms together. NAVARRO explained he did not

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                                    9

1  like to travel with "dope and guns" together. The UC explained he had drivers who could transport the

2  firearms so the UC would not be traveling with drugs and firearms at the same time. NAVARRO then

3  stated the "little" gun was a "Rossi" (i.e. a brand of firearm) and it was right down the street.

4  NAVARRO explained he was going to take the money provided by the UC and give it to his "boys" (i.e.

5  gang members/associates). He then stated he would get both firearms together and contact the CI and

6  the UC within three hours.

7          *4.*     *July 15, 2015: Purchase of Methamphetamine and a Semi-Automatic Handgun*

8        29.     On July 13, 2015, at approximately 12:39 p.m., the CI called NAVARRO and requested

9  another one-half pound of methamphetamine the upcoming Wednesday. They agreed to speak again.

10        30.     On July 14, 2015, at approximately 6:16 p.m., the CI called NAVARRO to confirm the

11  meeting the following day and NAVARRO affirmed. NAVARRO said his source wanted to know when

12  the CI and the UC wanted to "kick it up" (i.e. increase the drug purchase quantity).

13        31.     On this same date, at approximately 6:22 p.m., NAVARRO called the CI and asked to

14  move the meeting time up to 10:00 a.m; the CI agreed. NAVARRO then stated he had a personal, .45

15  caliber pistol for sale and quoted a price. NAVARRO also said he had two "clips" (i.e. magazines) for

16  the firearm and ammunition.

17        32.     On July 15, 2015, at approximately 9:45 a.m., the UC and CI arrived at the Monument

18  Oak Apartments located at 1391 Monument Blvd, in Concord, California. At approximately 10:15 a.m.,

19  NAVARRO arrived on foot and entered the UCV. NAVARRO produced the "1911" (a model of

20  pistol), two empty magazines, ammunition, and approximately 242.8 grams of methamphetamine. He

21  then provided these items to the UC, who in turn paid NAVARRO. NAVARRO said the handgun was a

22  "personal gun" and did not really want to sell it.

23        33.     The UC added he/she was pleased the way NAVARRO and his associates conducted

24  business because they were cautious and quiet. The UC then told NAVARRO that if he and his

25  associates and/or boss could deal larger quantities of drugs, the UC would schedule a meeting between

26  them, the UC, and the UC's boss. The UC asked NAVARRO to present this proposal to his associates.

27  NAVARRO said his associates wanted to "bump it up" (i.e. increase the drug sale quantities) and he

28  would talk to them about the proposal.

34.    The firearm purchased by the UC was subsequently identified as a Randall Firearms Manufacturing, model Raider, .45 caliber, semi-automatic pistol, bearing serial number: F0003294C.

**5.    *July 23, 2015: Purchase of Methamphetamine from NAVARRO***

35.    On July 21 and 22, 2015, NAVARRO and the CI had multiple calls discussing future drug and firearm dealings. During one of the calls, the CI told NAVARRO he contacted the UC, who wanted to purchase a whole pound of methamphetamine, as well as a firearm. NAVARRO later called the CI and provided a price for the methamphetamine, but said his source was "not ready" for the firearm sale and did not want to do this type of transaction "at all, yet." The CI said he/she understood and they agreed to meet the next day for the drug transaction.

36.    On July 23, 2015, at approximately 10:00 a.m., NAVARRO and CI spoke by telephone and confirmed the upcoming drug transaction and time of 10:30 a.m. NAVARRO added he had a "surprise," which he explained was the firearm. NAVARRO said he would contact his "boys" (i.e. gang members/associates) to see if they were ready. Later, NAVARRO called the CI at approximately 10:41 a.m. and said he and his associates were on their way to meet the UC and CI.

37.    At approximately 10:45 a.m., the UC and CI arrived at the Monument Oak Apartments located at 1391 Monument Blvd. in Concord, California. Soon thereafter, the UC and CI observed NAVARRO enter the parking lot on foot, entered the UCV, and met with the UC and the CI. NAVARRO delivered approximately 468.5 grams of methamphetamine to the UC and said he had an "AR" for sale, but needed to pick it up. The UC paid NAVARRO for the drugs and they agreed on a general time frame for the firearms sale. The UC explained his interest in purchasing firearms from NAVARRO and his associates if they were willingness to do so, but he/she did not want to make them do something they did not want to do. NAVARRO responded his "boys" were "a little bit paranoid" and so they sent NAVARRO to deal with the UC and CI. The UC then explained he and his associates were not "small timers" (i.e. low-level dealers) when it came to the narcotics business; his organization could distribute five (5) to ten (10) pounds of methamphetamine per week, but their bosses needed to meet given the amount of narcotics and money ("30 to 50 thousand dollars a week") involved, as well as the need to solidify trust. NAVARRO asked the UC about the amount of narcotics he wished to purchase as of the moment so that he could notify his associates. The UC told NAVARRO to tell his

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                                11

associates "five" (i.e. five pounds), but he/she need his/her boss's permission.  NAVARRO responded, "I fully understand."  NAVARRO then stated he would talk to his associates and would be in contact the UC.  NAVARRO then exited the vehicle and the meeting was concluded.  After the meeting and on this same date at approximately 10:59 a.m., NAVARRO called the CI.  NAVARRO said he would not be able to sell the firearm until 7:30 p.m. that evening when his source got off work.

### 6.    *July 23, 2015: Purchase of Firearm and Ammunition from NAVARRO and CORTES*

38.    On July 23, 2015, NAVARRO and the CI spoke by telephone multiple times to coordinate the anticipated firearms buy.  At approximately 6:47 p.m., NAVARRO called the CI to confirm the firearms transaction at 7:30 p.m. because he had contacted his associates (i.e. confirmed the firearms transaction with his co-conspirators).  Later, NAVARRO called the CI again to relay his "boys" (i.e. gang members/associates) had been delayed, but they were on their way and the meeting was still "good" (i.e. occurring as planned).  They exchanged a few more calls, in which NAVARRO said his associates were on their way and asked if CI and UC could go to his house.  The CI agreed to do so.

39.    At approximately 8:35pm, the UC and CI arrived at 1082 Mohr Lane, Apt. B in Concord, California (i.e. NAVARRO's residence).  They met NAVARRO in the driveway and he said the firearm was inside the garage.  The UC, CI, and NAVARRO went inside and met with other Hispanic males, including CORTES.  NAVARRO then entered a small room attached to garage and retrieved a rifle case containing a rifle.  NAVARRO removed the rifle from the case and handed it to the UC.  While the UC was examining the firearm, CORTES stated, "There's an extra little magazine on the bottom, too."  The UC handed the firearm to NAVARRO, who placed it back in the case, along with the ammunition.  The UC, CI, and NAVARRO then exited the garage and carried the firearm to the trunk of the UCV. NAVARRO then entered the UCV with the UC and the CI and the UC paid NAVARRO $1,700 to complete the transaction.  The UC then asked NAVARRO if he had spoken to his "boy" (i.e. boss/associate) about meeting the UC's boss.  NAVARRO stated that he had and his boss was "iffy" (i.e. wary) about meeting.  NAVARRO then stated he had some "news" for the UC, but would discuss it later.  Their meeting ended.

///

39.   The firearm and ammunition purchased by the UC are described as follows:

- One (1) Kel-Tec, CNC Industries, model SU-16, .223 caliber, semi-automatic rifle, bearing serial number: N2E03,[9] and a magazine;

- One (1) .223 caliber magazine;

- Twenty (20) rounds of PMC, .223 caliber ammunition;

- Twenty (20) rounds of Federal, .223 caliber ammunition;

- Thirty (30) rounds of LC (Lake City), .223 caliber ammunition; and

- Eight (8) rounds of LC (Lake City), .223 caliber ammunition.

### 7.   *July 27, 2015: Meeting between UC and CORTES*

40.   On July 26, 2015, at approximately 4:16 p.m., the CI called NAVARRO, but NAVARRO did not answer. Roughly one minute later, the CI sent a text message to NAVARRO stating the CI wished to meet with him the next day.

41.   On July 27, 2015, at approximately 12:57 p.m., the CI received a call from NAVARRO's telephone and recorded it. The caller identified himself as "Trigger" (i.e. CORTES) and informed the CI that "Stoner" (i.e. NAVARRO) had recently been incarcerated. CORTES agreed to meet with the CI if NAVARRO was not released from custody soon.

42.   At approximately 2:28 p.m., the CI received and recorded another call from CORTES via NAVARRO's telephone. During the call, CORTES and the CI agreed to meet at a Starbucks located at 2370 Monument, Blvd. in Pleasant Hill, California because CORTES was unsure of NAVARRO's status. Roughly an hour later, they spoke again via NAVARRO's telephone and CORTES said "they" would make their way to meet with the UC and CI.

43.   Later, at approximately 3:51 p.m., the CI and UC arrived at the Starbucks and observed CORTES exit a Ford Crown Victoria and walk towards the UCV. CORTES then entered the UCV and met with the UC and CI. CORTES explained his understanding of NAVARRO's arrest and the UC asked whether CORTES spoke with NAVARRO about the UC's request (i.e. scheduling a meeting for their respective bosses to discuss future drug trafficking). CORTES replied, "we got it" (i.e. CORTES

---

[9] This firearm was not manufactured in California.

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                                    13

1   and his associates/gang members were prepared to move forward) and he wanted to know how much the

2   UC wished to "move up to" (i.e. what quantity of drugs the UC desired).  The UC said his/her

3   organization could distribute five (5) to ten (10) pounds of methamphetamine per week, but a meeting

4   between the UC's boss and CORTES and his associates was required before proceeding further.

5   CORTES responded his concern was similar; CORTES said he and his associates did not want to be

6   sitting "around all that dope" while the UC and his associates did not want to be "sitting around the

7   money."  CORTES offered to lower the price per pound to $5,500 for a five (5) pound

8   methamphetamine purchase and promised a further price reduction for even larger quantities.  CORTES

9   said he only needed a date and the drugs would be ready for the UC.  The UC provided CORTES with

10  more background on his/her (fake) drug trafficking organization and explained he/she would be gone for

11  two weeks dealing with his/her drug customers located elsewhere.  With regard to meeting the UC's

12  boss, CORTES said, "We're ready to meet whenever."  They agreed to talk further and CORTES

13  provided his telephone number of (925) 435-7400 to the UC.  CORTES said it would take

14  approximately one to two weeks to acquire five pounds of methamphetamine.  CORTES elaborated that

15  he had "damn near" enough because he had three pounds "sitting around" and only needed to acquire

16  two more.

17         44.    During the meeting, the UC also explained his/her interest in purchasing firearms and

18  CORTES said he was the "gun guy" and the guns always came through him.  CORTES elaborated that

19  some guns were too expensive so he did not even tell the UC about them.  The UC explained the

20  firearms he/she purchased were transported to Mexico and CORTES responded he had a "solid line on

21  AR's" (i.e. assault rifles).   CORTES asked how many AR's the UC desired and he/she said to start with

22  ten. CORTES said he needed to talk to his source.  The UC and CORTES agreed to set up a meeting the

23  UC's boss and their meeting ended.

24         45.    Shortly after the meeting, at approximately 4:17 p.m., the UC called CORTES at (925)

25  435-7400 and relayed that the UC's boss would arrive on Wednesday to meet with CORTES and

26  CORTES's boss.  CORTES responded he did not really have a boss and NAVARRO conducted

27  business through him.  CORTES further explained his boss would have to come from "down south" (i.e.

28  possibly Mexico, a common source for methamphetamine) and his boss did not have the time or interest

NAVARRO AFF. IN SUPPORT OF COMPL.

in coming up to meet new people. CORTES elaborated this was the reason CORTES was the person

they "set up out here" (i.e. CORTES was the regional point of contact for his organization). The UC

then told CORTES to bring whoever else engaged in this endeavor with him to the meeting. CORTES

explained he would place the UC's order with his boss, who would fulfill it within one or two days.

CORTES stated that if anything, his boss would order CORTES to attend the meeting himself. The UC

then asked CORTES about his other associate (CHAVEZ-NAVARRETE) and CORTES stated

CHAVEZ-NAVARRETE was just his "boy" (i.e. gang member/associate) and gave him rides because

CORTES did not have a vehicle.

### 8.    *July 31, 2015: Purchase of Methamphetamine from CORTES*

46.    On July 31, 2015, at approximately 10:01 a.m., the UC placed a recorded call to

CORTES at (925) 435-7400 and the participants agreed to meet to conduct a drug transaction. Later that

morning, the UC's and the CI arrived at the Monument Oak Apts. in the UCV. A second undercover

vehicle (UCV-2) arrived with them and was driven by UC-2. At approximately 10:56 a.m., the UC and

the CI exited the UCV to await CORTES's arrival while UC-2 remained in the UCV-2. At

approximately 10:59 a.m., the UC observed a Ford Crown Victoria enter the apartment complex and

park in a parking lot out of his/her view. Shortly thereafter, CORTES emerged from the rear side of the

complex on foot. The UC, CI, and CORTES next entered the UCV-2. CORTES placed the

approximately 2,377 grams of methamphetamine[10] (weight with packaging) inside a hidden

compartment of the UCV-2. Afterwards, CORTES said he was interested in having a hidden

compartment built for himself and the UC paid CORTES $27,500 for the five (5) pounds of

methamphetamine. They discussed future drug deals and then departed separately.

### C.    **Arrest of CORTES and CHAVEZ-NAVARRETE After Providing Armed Security During a Simulated Drug Transaction**

### i.    *Overview*

47.    On August 19, 2015, a joint-agency operation involving the use of multiple undercover

ATF agents took place, resulting in the arrest of CORTES and CHAVEZ-NAVARRETE. During the

---

[10] The suspected drugs were separated into five packages and a presumptive test was conducted on one of the five and found to be positive for the presence of methamphetamine.

NAVARRO AFF. IN SUPPORT OF COMPL.

[UNDER SEAL]                                    15

1    operation, the UC posed as a drug customer receiving a (simulated) drug delivery from three other

2    undercover agents posing as high-level drug dealers.  The UC asked for and received the support of

3    CORTES and CHAVEZ-NAVARRETE in facilitating delivery; they provided armed "security" for the

4    UC and served as look-outs during the transaction.

5         *ii.*    ***Circumstances Leading to Arrest***

6         48.    On August 19, 2015, at approximately 12:20 p.m., the UC and the CI arrived at a Motel 6

7    Oakland-Embarcadero, which is located at 1801 Embarcadero E. in Oakland, California, and waited for

8    the CORTES's arrival.  At approximately 1:06 p.m., the UC and CI observed CHAVEZ-NAVARRETE

9    and CORTES arrive in a Ford Expedition.  The UC and CI exited their vehicle (referred to herein as the

10   "UCV") and approached CORTES and CHAVEZ-NAVARRETE.  The UC asked if they were

11   "strapped" (i.e. armed) and "ready to roll" (i.e. prepared to provide security for a drug deal).  CORTES

12   responded, "yeah," and CHAVEZ-NAVARRETE nodded affirmatively.  The UC then instructed

13   CORTES and CHAVEZ-NAVARRETE to follow him/her to another location where they would provide

14   the UC and CI with protection for the drug transaction.  The parties returned to their vehicles and

15   departed the area.

16        49.    Next, CHAVEZ-NAVARRETE and CORTES followed the UCV to Vantage Point Park,

17   Embarcadero E., in Oakland, California (hereafter, "Vantage Point").  Upon arrival, the UC parked the

18   UCV and exited.  The UC then instructed CHAVEZ-NAVARRETE to park across the street from

19   Vantage Point, in a gravel lot where they could observe the anticipated drug transaction without looking

20   suspicious, but could still provide protection (i.e. armed security).  The UC told CHAVEZ-

21   NAVARRETE and CORTES to make sure "everything's good" during the transaction and they both

22   affirmatively agreed.  The UC described his/her plan for the transaction, explaining it would occur as

23   quickly as possible so he/she would not be sitting on the lot with "three keys" (i.e. three kilograms of

24   cocaine) and a large quantity of cash.  The UC also further instructed CHAVEZ-NAVARRETE and

25   CORTES to not return to the lot until the individuals providing the drugs (i.e. the other undercover

26   agents) had departed and the UC gave them the signal to return.  CHAVEZ-NAVARRETE and

27   CORTES agreed with the UC and parked across the street.

28   ///

50.    At approximately 1:17 p.m., three undercover agents posing as drug dealers (hereafter, the "Dealers") arrived and met with the UC and CI at Vantage Point. The Dealers conducted a simulated drug transaction and transferred three kilograms of (sham) cocaine to the UCV. The Dealers then departed the area. Shortly thereafter, the UC signaled to CHAVEZ-NAVARRETE and CORTES to return the lot. CHAVEZ-NAVARRETE and CORTES drove over and exited their vehicles. The UC thanked them both for providing protection and paid each $200 for their services. Next, the UC showed CHAVEZ-NAVARRETE and CORTES the (sham) kilograms of cocaine, located within a built-in, hidden compartment within the UCV. CHAVEZ-NAVARRETE and CORTES were arrested shortly thereafter and two firearms were discovered inside their nearby Ford Expedition.

## IV.    CONCLUSION

51.    Based on the foregoing facts, my training and experience, and consultation with other law enforcement agents with experience in drug trafficking investigations, I believe there is probable cause to believe that Adrian NAVARRO, Jesus CORTES, and Jose Luis CHAVEZ-NAVARRETE violated 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to distribute drugs and possession with intent to distribute/distribution of controlled substances).

JAMES TALLEY
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed to and sworn before me
this 20th day of August, 2015.

HONORABLE DONNA M. RYU
United States Magistrate Judge

NAVARRO AFF. IN SUPPORT OF COMPL.
[UNDER SEAL]                                    17